UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WASHINGTON REGIONAL MEDICORP DBA FAYETTEVILLE CITY HOSPITAL,<br><br>Plaintiff,<br><br>v.<br><br>SYLVIA MATHEWS BURWELL, Secretary, U.S. Department of Health and Human Services,<br><br>Defendant. | Case No. 1:13-cv-00622 (CRC) |

**MEMORANDUM OPINION**

Fayetteville City Hospital, an Arkansas inpatient psychiatric facility, challenges the method used by the Secretary of Health and Human Services to calculate the hospital's reimbursement for services it provided to Medicare patients in the two years after statutory caps on reimbursements expired in 2002. Because the relevant provisions of the Medicare statute, 42 U.S.C. § 1395 et seq., required the Secretary's calculation method and, alternatively, because she reasonably interpreted the statute and its implementing regulations in calculating the reimbursement amount, the Court will deny Fayetteville's summary judgment motion and grant the Secretary's.

**I.     Background**

The factual background of this case is not in dispute. The Centers for Medicare and Medicaid Services ("CMS")—the branch of the Department of Health and Human Services that administers the Medicare program—reimburses hospitals for services provided to Medicare patients based on annual cost reports. Pl.'s Mot. Summ. J. at 2. Until 1983, CMS calculated

1

reimbursements based on a "reasonable-cost" payment system: A hospital reported its actual costs of serving Medicare patients, and CMS reimbursed the hospital for those costs it determined were reasonable. Id. In 1983, Congress amended the Social Security Act to replace the "reasonable-cost" system with a prospective payment system ("PPS") for inpatient hospital services. Social Security Act Amendments of 1983, Pub. L. No. 98-21, 97 Stat. 65. The PPS bases hospital reimbursement on prospectively-determined national rates, rather than actual costs. Pl.'s Mot. Summ. J. at 2. In other words, CMS sets an amount in advance that a hospital will receive for each discharge; it does not examine the hospital's actual costs and decide after the fact which will be reimbursed.

Congress initially excluded from the PPS certain types of hospitals, including psychiatric hospitals like Fayetteville. Pub. L. No. 98-21, § 601(e). Pursuant to the Tax Equity and Fiscal Responsibility Act ("TEFRA"), CMS continued to reimburse those hospitals on a reasonable-cost basis, but limited reimbursements to a "target amount." Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248 (codified at 42 U.S.C. § 1395ww(b) (2012)). In the first year a hospital reported its costs under TEFRA—sometimes referred to as its "base year"—the "target amount" equaled its "allowable operating costs" for the previous reporting period. Id. § 1395ww(b)(3)(A)(i). In subsequent years, the target amount equaled the target amount for the previous year, plus an adjustment factor. Id. § 1395ww(b)(3)(A)(ii). As a result, reimbursements could increase only as fast as the adjustment factor allowed. The Secretary issued regulations implementing these statutory provisions. See 42 C.F.R. § 413.40(c)(4). So far, so good.

Congress complicated this relatively straightforward calculation with the passage of the Balanced Budget Act of 1997 ("BBA"). Pub. L. No. 105-33 (codified at 42 U.S.C. §

2

1395ww(b)(3)(H)).  Reflecting a concern that "[p]ayments to PPS-exempt hospitals represent some the fastest growing expenditures to Medicare," the BBA added a new section to TEFRA that imposed caps on target amounts.  H.R. Rep. No. 105-149, at 1336 (1997).  From 1998 through 2002, a PPS-exempt hospital's target amount could not exceed the 75th percentile of the 1996 target amounts of a similar class of PPS-exempt hospitals, plus an update factor.  42 U.S.C. § 1395ww(b)(3)(H).

The Secretary issued regulations implementing the BBA's new 75th percentile cap regime.  42 C.F.R. § 413.40(c)(4).  The regulations established a three-step process for determining a hospital's annual target amount.  First, a provider's fiscal intermediary[1] determined the hospital's target amount in its TEFRA base period, as adjusted by the update factors.  The result of that calculation was the "hospital specific target amount."  Id. § 413.40(c)(4)(iii)(A).  Second, the fiscal intermediary determined the 75th percentile target amount.  Id. § 413.40(c)(4)(iii)(B).  Finally, the regulations called for a comparison of the two amounts and set the hospital's reimbursable "target amount" at the lower of the two figures.  Id. § 413.40(c)(4)(iii).  Like the BBA caps, the regulation implementing the caps applied from cost years 1998 through 2002.[2]

The plot thickened in 1999 with the passage of the Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act.  Pub. L. No. 106-113, § 123, 113 Stat. 1501 (1999).  That Act directed the Secretary to move psychiatric hospitals onto the prospective payment reimbursement

---

[1] Fayetteville explains that "[d]uring the time relevant to this case, the Secretary had agreements with organizations known as 'fiscal intermediaries,' [which] administered Medicare payment and performed other Medicare program functions for providers on a regional or national basis. At the time of these appeals, the fiscal intermediary . . . for Fayetteville was Pinnacle Business Solutions, Inc."  Pl.'s Mot. Summ. J. at 2.

[2] In 2005, as discussed in more detail below, CMS amended paragraph (c)(4)(iii) to add a preamble:  "For cost reporting periods beginning on or after October 1, 1997 through September 30, 2002 . . . ."

3

system.  See Mich. Dep't of Cmty. Health v. Sec'y of Health and Human Servs., 496 F. App'x 526, 529 (6th Cir. 2012), cert. denied, 133 S. Ct. 1581 (2013) (describing the effect of the Balanced Budget Refinement Act).  The law called for the new system to take effect in October 2002, just as the BBA caps were scheduled to expire.  CMS, however, did not begin reimbursing psychiatric hospitals based on the PPS until 2005.  Id. at 530.  As a result, the Secretary had to determine how to calculate reimbursements in the period between the expiration of the BBA caps in 2002 and the beginning of the PPS transition.  In May 2002, the Secretary issued a notice in the Federal Register explaining that reimbursements would be calculated in accordance with the general TEFRA provisions on rates of increase.  For cost reporting periods beginning in fiscal year 2003, the hospital would be paid based on the previous period's target amount, updated by the appropriate adjustment factor.  67 Fed. Reg. 31,404, 31,491 (May 9, 2002).  Fayetteville's fiscal intermediary initially informed the hospital by letter that it would be reimbursed based on the "hospital-specific target amount," but then, apparently at CMS's direction, revised its letter to state that 2003 reimbursement amounts would be updated by an adjustment factor from the 2002 target amount.  Compl. ¶¶ 24–26.

And there's the rub.  Fayetteville contends that calculating its 2003 reimbursement based on its 2002 target amount (which was limited by the 75th percentile cap) effectively extended the BBA caps after their expiration.  Pl.'s Mot. Summ. J. at 22.  It argues that the Secretary should have instead based the 2003 reimbursements on Fayetteville's "hospital specific target amount," *i.e.*, the net allowable costs in its base period, updated by the appropriate rate-of-increase percentage.  Pl.'s Mot. Summ. J. at 16.  That method would have negated the effect of the BBA caps in place in fiscal year 2002 and generated higher reimbursements.

4

Fayetteville ultimately received a Notice of Program Reimbursement ("NPR") for both 2003 and 2004 reflecting CMS's lower reimbursement calculations. It timely appealed the NPRs to the Provider Reimbursement Review Board, which affirmed CMS's calculation of the reimbursements. Compl. ¶¶ 29–32. The Board also certified the dispute for expedited judicial review. Id. ¶¶ 38–39; see 42 U.S.C. § 1395oo(f)(1) (authorizing federal district court review of final Board decisions). This suit followed.

## II. Standard of Review

### A. Summary Judgment

Both parties move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court will grant summary judgment under Rule 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Each party moving for summary judgment bears the responsibility of justifying the basis for its motion and the support in the record for the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In this Administrative Procedures Act case, the parties rely exclusively on legal arguments regarding the Secretary's interpretation of the relevant statute and regulations. The Court is thus called upon to resolve legal questions only. See James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996).

### B. Review of Agency Action

Fayetteville brings this action under the APA, 5 U.S.C. § 701 et seq. Under the APA, the Court must set aside a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court does not substitute its discretion for that of the agency, but rather engages in a narrow review of whether the agency

has offered a rational explanation of the choice it has made. See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Under the familiar Chevron two-step standard, the Court first uses the traditional tools of statutory interpretation to determine "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842 (1984). If Congress's intent is clear, that is the end of the matter. Id. at 842–43. If, however, the statute is silent or ambiguous, the court proceeds to step two, asking whether the agency's interpretation "is based on a permissible construction of the statute." Id. at 843. The agency's construction at step two is permissible "unless it is arbitrary or capricious in substance, or manifestly contrary to the statute." Mayo Found. for Med. Educ. & Research v. United States, 131 S. Ct. 704, 711 (2011). The degree of delegation from Congress influences the level of deference the Court accords to the agency. See United States v. Mead Corp., 533 U.S. 218, 229 (2001). In matters of Medicare, the authority delegated to CMS from Congress is extremely broad. See Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 497 (2002).

### III. Analysis

#### A. Prior case law

This Court is not the first to confront the effect of the BBA cap expiration on Medicare reimbursements for psychiatric hospitals. Three circuits have decided APA challenges to the Secretary's post-BBA calculation method based on virtually identical facts. In the first decision, the Fifth Circuit reversed the district court and sided with the hospital. See Hardy Wilson Mem'l Hosp. v. Sebelius, 616 F.3d 449 (5th Cir. 2010). It found the statute ambiguous as to the proper calculation method, but declined to defer to the agency's interpretation of its own implementing regulation because, in its view, the regulation and the Secretary's 2002 explanatory notice

unambiguously supported the hospital's position.  Id. at 456, 460.  More recently, the Sixth and Third Circuits have affirmed district court decisions in favor of the Secretary.   Both circuits concluded that TEFRA unambiguously required 2003 reimbursement rates to be updated from 2002 target amounts, notwithstanding that the 2002 target amounts had been capped for those plaintiffs.  See Mich. Dep't of Cmty. Health, 496 F. App'x at 526, 533; Ancora Psychiatric Hosp. v. Sec'y of the U.S. Dept. of Health and Human Servs., 417 F. App'x 171, 176 (3d Cir. 2011).  Both courts also ruled, in the alternative, that even if the statute were ambiguous, the Secretary's interpretation of the statute and its implementing regulations was reasonable and therefore entitled to deference.  See Mich. Dep't of Cmty. Health, 496 F. App'x at 536; Ancora Psychiatric Hosp., 417 F. App'x at 176.

The Court is persuaded by the Sixth and Third Circuits' reasoning and conclusions, which it incorporates in the following discussion.  The Court will begin with the statute before turning to the implementing regulations.

**B.     The Statute**

As noted above, prior to the imposition of the BBA caps, TEFRA provided that psychiatric hospitals would be reimbursed for services provided to Medicare patients based on their "target amounts."  TEFRA defines target amount as follows:

> (3)(A) [F]or purposes of this subsection, the term "target amount" means, with respect to a hospital for a particular 12-month cost reporting period—
>
>> (i) in the case of the first such reporting period for which this subsection is in effect, the allowable operating costs of inpatient hospital services . . . recognized under this subchapter for such hospital for the preceding 12-month cost reporting period, and
>>
>> (ii) in the case of a later reporting period, the target amount for the preceding 12-month cost reporting period,

7

increased by the applicable percentage increase under subparagraph (B) for that
particular cost reporting period.

42 U.S.C. § 1395ww(b).

In the BBA, Congress added a new subsection to TEFRA that, during fiscal years 1998 through 2002, capped target amounts at "the 75th percentile of the target amounts" of similar classes of hospitals in 1996, as adjusted. 42 U.S.C. §§ 1395ww(b)(3)(H)(i), (ii). Although Congress had instructed CMS to begin reimbursing hospitals like Fayetteville based on the prospective payment system when these BBA caps expired, CMS had not yet implemented the new system by the end of fiscal year 2002. As a result, CMS was required to calculate Fayetteville's 2003 (and 2004) reimbursement based on the TEFRA provisions that remained applicable. Those provisions gave CMS two options: base the hospital's reimbursement either on actual costs under subsection (3)(a)(i) above, or on the previous year's target amount (as adjusted) under subsection (3)(a)(ii). Subsection (i), however, applied only to the "the first . . . reporting period for which this subsection is in effect," 42 U.S.C. § 1395ww(b)(3)(a)(i), which was prior to the years in question. Therefore, the statute directed CMS to calculate Fayetteville's 2003 target amount under subsection (ii); that is, by updating its 2002 target amount by an adjustment factor. And that is precisely what CMS did.

Fayetteville argues that by taking this approach, CMS improperly extended the BBA caps beyond the period that Congress intended them to apply. Pl.'s Mot. Summ. J. at 12. It contends that CMS instead should have calculated its 2003 reimbursement based on the comparison outlined in paragraph (c)(4)(iii) of the regulations (which are excerpted below), and paid Fayetteville the "hospital specific target amount." See id. at 16; 42 C.F.R. § 413.40(c)(4)(iii).

There is no doubt that reverting to the pre-BBA method of calculating reimbursement perpetuated the effect of the BBA caps. CMS did not, however, "apply" or "extend" the expired

8

caps; it applied the existing statutory provisions, the effect of which was to establish the 2002 capped amount as the baseline for the target amount in the subsequent year. 42 U.S.C. §§ 1395ww(b)(3)(A)(ii), 1395ww(b)(3)(H). This "echo effect" alone does not render the statute ambiguous or CMS's calculation *ultra vires*. See Ancora Psychiatric Hosp., 417 F. App'x at 176 ("Given a statutory structure where target amounts are supposed to grow by a specific inflationary percentage each year, it is neither surprising nor obviously contrary to Congressional intent that a limitation imposed in one year would have a kind of 'echo' effect in subsequent years."). The primary test of statutory ambiguity is the language of the statute itself and, as explained above, TEFRA clearly directed CMS to calculate a target amount by updating the previous year's target amount.

The lingering effect of the 2002 capped amount is not clearly contrary to Congress' intent. Indeed, Congress imposed the BBA caps in order to limit payments to PPS-exempt hospitals, which "represent[ed] some of the fastest growing expenditures to Medicare." H.R. Rep. No. 105-149, at 1336 (1997). And Congress expected the caps to remain in place until the exempted hospitals moved to the PPS after fiscal year 2002. See Mich. Dep't of Cmty. Health, 496 F. App'x at 529. Interpreting the statute to require reimbursements based on the prior reasonable-cost system would therefore undermine the cost-reduction goals that motivated Congress to impose the caps in the period leading up to the PPS. See id. at 536 ("Congress repeatedly stated its intent to desert a hospital-specific cost based system, and even passed two separate pieces of legislation in a two-year period to implement this intention."). The Court agrees with the Third and Sixth Circuits that Congress did not likely intend that result.

## C. The Regulations

Like the Third and Sixth Circuits, the Court also concludes that, even if the expiration of the BBA caps created uncertainty as to how to calculate Fayetteville's 2003 target amount under 42 U.S.C. § 1395ww(b)(3)(A), the Secretary reasonably resolved that ambiguity with a permissible construction of the CMS regulations at 42 C.F.R. § 413.40(c)(4). See Mich. Dep't of Cmty. Health, 496 F. App'x at 540; Ancora Psychiatric Hosp., 417 F. App'x at 176.

The Secretary issued the relevant regulations in two steps. After Congress passed TEFRA in 1982, the Secretary promulgated regulations on determing target amounts. See 47 Fed. Reg. 43,282, 43,291 (Sept. 30, 1982). Those regulations stated:

> (c)(4) Target amount (ceiling). The intermediary will establish for each hospital a ceiling on the reimbursable costs per case of that hospital. The ceiling for each 12-month cost reporting period will be set at a target amount determined as follows:
>
> (c)(4)(i) For the first 12-month cost reporting period to which this ceiling applies, the target amount will equal the hospital's allowable operating costs per case for the hospital's base period increased by the target rate percentage for the subject period.
>
> (c)(4)(ii) For subsequent 12-month cost reporting periods, the target amount will equal the hospital's target amount for the previous 12-month cost reporting period increased by the target rate percentage for the subject cost reporting period.

Id. at 43,292. After passage of the BBA, the Secretary added paragraph (iii) to implement the BBA cap scheme for fiscal years 1998 through 2002:

> (c)(4)(iii) In the case of a psychiatric hospital . . . the target amount is the lower of the amounts specified in paragraph (c)(4)(iii)(A) or (c)(4)(iii)(B) of this section.
>
> (A) The hospital-specific target amount.
>
> (1) In the case of all [psychiatric] hospitals . . . the hospital-specific target amount is the net allowable costs in a base period increased by the applicable update factors.
>
> . . .
>
> (B) One of the following for the applicable cost reporting period—

10

> (1) For cost reporting periods beginning during fiscal year 1998, the 75th percentile of target amounts for hospitals in the same class [as updated] . . .
>
> (2) For cost reporting periods beginning during fiscal year 1999, the amount determined under paragraph (c)(4)(iii)(B)(1) of this section, [as updated] . . .
>
> (3) For cost reporting periods beginning during fiscal year 2000 [the 75th percentile of target amounts for hospitals in the same class as updated with wage adjustments] . . .
>
> (4) For cost reporting periods beginning during fiscal years 2001 through 2002, [the 75th percentile of target amounts for hospitals in the same class as updated with market basket and wage adjustments]

42 C.F.R.§ 413.40(c)(4)(iii) (2002).

Consistent with the regulation, from 1998 to 2002 CMS calculated Fayetteville's target amount under (c)(4)(iii) by comparing its "hospital specific target amount" and its BBA capped amount. For Fayetteville, the lower of the two was the capped amount. For fiscal year 2003, however, CMS concluded that (c)(4)(iii) no longer applied because the caps it implemented had expired. Accordingly, CMS disregarded that paragraph and calculated Fayetteville's target amount, as it had done prior to imposition of the caps, by reference to (c)(4)(ii).

Fayetteville argues that (c)(4)(iii) did not expire in its entirety when the caps ended. Pl.'s Opp'n to Def.'s Mot. Summ. J. and Reply at 11–12. By its reading, only subparagraph (B) expired because only that subparagraph was explicitly limited to the five years the caps were in the effect. Subparagraph (A), in contrast, had no temporal limitation until CMS added one in 2005. 70 Fed. Reg. 47,464–66, 47,487 (Aug. 12, 2005). Fayetteville thus contends that the regulation required CMS to use Fayetteville's "hospital specific target amount" under subparagraph (A) as its target amount for 2003 and 2004.

The Court declines to adopt such an artificial reading of the regulations. The expiration of the caps rendered the entirety of paragraph (c)(4)(iii) superfluous. As the Sixth Circuit explained in Michigan Department of Community Health, accepting Fayetteville's position

would require the Court to interpret the regulation contrary to the statute it implemented. 496 F. App'x at 539 ("In the face of the inability to enact the [PPS] in the time frame directed by Congress, the Agency based reimbursements after the BBA caps expired in 2002 on the amount of the previous year's reimbursement, which is, as explained above, compelled by the statute."); see also United States v. Larionoff, 431 U.S. 864, 873 (1977) ("regulations, in order to be valid must be consistent with the statute under which they are promulgated"); United States v. Quinn, 401 F. Supp. 2d 80, 93 (D.D.C. 2005) (holding that a regulation implementing a statute that was no longer valid did not have a legislative foundation). Paragraph (iii) had a specific purpose—implementation of the BBA caps—which no longer existed after the expiration of the caps. The Secretary therefore reasonably disregarded paragraph (iii) when calculating post-cap target amounts. Mich. Dep't of Cmty. Health, 496 F. App'x at 540–41.

Fayetteville's interpretation is also illogical. Paragraph (c)(4)(iii) provided that the target amount during the BBA cap period was the lower of subparagraphs (A) and (B). The comparison would be meaningless, however, if only subparagraph (A) remained in effect as Fayetteville argues. Nothing required CMS to engage in that empty exercise.

In sum, recognizing the substantial deference given to the Secretary's interpretation of Medicare regulations and the uncertainty brought on by the delay in implementing the PPS for psychiatric hospitals, the Court finds that, even if TEFRA is unclear as to how to calculate reimbursements after the BBA caps expired, CMS reasonably reverted to paragraph (c)(4)(ii) to calculate Fayetteville's 2003 and 2004 target amounts. Those target amounts did not result from an application or extension of the expired BBA caps, but rather from a logical and straightforward application of 42 U.S.C § 1395ww(b)(3)(A)(ii) and the implementing regulations.

### D.     Retroactivity

Finally, Fayetteville contends that Secretary's 2005 addition of a temporal limitation to the preamble of (c)(4)(iii)—which made it clear that the paragraph did not apply to cost years after 2002—was an improper retroactive change to the regulation. A regulatory change is retroactive if it "attaches new legal consequences to events completed before its enactment." Landgraf v. USI Film Products, 511 U.S. 244, 269–70 (1994). The law generally disfavors retroactive rule-making. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). The Medicare statute is no exception—it requires an opportunity for notice and comment, and findings by the Secretary, before CMS can implement retroactive, substantive changes in regulations. See 42 U.S.C. §§ 1395hh(a)(1)-(4), 395hh(e)(1)(A).

Fayetteville argues that the addition of a temporal limitation to the preamble of paragraph (c)(4)(iii) was a substantive, retroactive change that required notice and comment. See Hardy Wilson Mem'l Hosp. v. Sebelius, 616 F.3d 449, 461 (5th Cir. 2010) (holding that the 2005 amendment was a substantive change). It also asserts that the Secretary knew the change was retroactive, pointing to 2002 statements in the Federal Register that purportedly demonstrate that CMS previously shared Fayetteville's understanding of the regulation.

The Court disagrees. The 2005 addition to the preamble of paragraph (c)(4)(iii) merely clarified that the paragraph, as outlined above, was superfluous because Congress had not authorized the BBA caps after 2002. See Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue, 297 U.S. 129, 134–35 (1936) (holding that "[a] regulation which . . . operates to create a rule out of harmony with the statute, is a mere nullity" and amending it is not a retroactive change). Moreover, the Federal Register passages cited by Fayetteville actually reflect the Secretary's contemporaneous understanding that pre-cap TEFRA provisions would apply after

the expiration of the BBA caps. 67 Fed. Reg. 31,404, 31,491 (May 9, 2002) (specifying that hospitals would be paid in accordance with paragraph (c)(4)(ii)—not paragraph (c)(4)(iii)—and the target amount would be updated by an adjustment factor from the previous year's target amount). Thus, no "new legal consequences" could flow from reiterating the agency's original view. Landgraf, 511 U.S. at 269–70.

## IV. Conclusion

For the reasons explained above, the Court will deny Fayetteville's motion for summary judgment and grant the Secretary's.

CHRISTOPHER R. COOPER
United States District Judge

Date:  October 31, 2014